## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NANCY ISAACS,<br><br>*Plaintiff*,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC.<br><br>*Defendants*. | Case No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Nancy Isaacs ("Plaintiff" or "Ms. Isaacs"), by and through her undersigned counsel, Yook DiPisa LLC, bring this complaint ("Complaint") against Defendant Volkswagen Group of America, Inc. ("Defendant" or "VWGOA"). Plaintiff alleges the following upon personal knowledge as to herself and her own acts, and information and belief as to all other matters. Plaintiff's investigation into the factual allegations contained in this Complaint is continuing, and many of the relevant facts are known only by VWGOA or are exclusively within its custody or control. Plaintiff believes that substantial evidentiary support will exist for the allegations contained in this Complaint after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.     Plaintiff brings this action pursuant to New York's Human Rights Law (N.Y. Executive Law § 296, *et seq.*) for unlawful discrimination and retaliation in connection with the terms and conditions of Plaintiff's employment and Plaintiff's retaliatory termination. Specifically, Plaintiff alleges that VWGOA discriminated against her on the basis of her documented disability of her back, engaged in gender discrimination, condoned sexual harassment, and retaliated against her for engaging in protected activities.

2.      Ms. Isaacs had been employed by VWGOA since 2014 as a Business Development Manager for the Northeast Region. Within the Northeast Region, there were thirteen (13) Business Development Managers in total, ten (10) of whom were men and three (3) were women.

3.      Plaintiff was the only Business Development Manager residing in the State of New York, maintaining her residence in Albany, New York, which was both centrally located within her assigned territory and provided convenient access to other regions of the State of New York.

4.      Ms. Isaacs's responsibilities required her to travel approximately eighty percent (80%) of the time traveling on site to Volkswagen and (affiliated) Audi dealerships, which was in addition to making calls to dealerships, attending conference calls, and responding to emails.

5.      Despite the significant physical demands of weekly travel and long-distance driving, Ms. Isaacs consistently performed her essential job functions while managing a serious back-related disability, which she had repeatedly disclosed to VWGOA.

6.      Until the time her requests for short-term disability leave began to be discouraged, Ms. Isaacs had been a dedicated team player always going above and beyond her normal daily expected duties.  Ms. Isaacs consistently stepped in to resolve issues as they arose, strived to always do her best, and was recognized by executive management through positive feedback, including handwritten notes and gifts.

7.      For example, in 2019, Ms. Isaacs commuted for approximately eight (8) months, traveling three and a half (3.5) hours at least four (4) days a week, including weekends, from Wappingers Falls to Long Island City. This was done to provide on-site supervision in connection

2

with a dealership issue involving a dealer in Long Island City[2] who was out of trust on its floor plan agreement.[3]

8.    Similarly, in 2023, Ms. Isaacs again demonstrated her commitment to her job and VWGOA by assisting the Title Escalation Team in Columbia, South Carolina. She remained on-site for nearly five (5) weeks, personally incurring additional expenses (including dog boarding), for which she was never reimbursed, in order to support Defendant in resolving a significant title debacle. For these efforts, she received accolades in recognition of her contributions.

9.    Plaintiff's direct supervisor, VWGOA's Northeast Regional Director John McNelis, has demonstrated a preference for a male-dominated team. He has consistently shown preferential treatment toward a select group of male employees with whom he maintains strong personal relationships.

10.    Ms. Isaacs repeatedly sought reasonable accommodation for her documented disability by requesting short-term disability leave. However, VWGOA consistently discouraged her requests and failed to engage in any meaningful interactive process with Ms. Isaacs concerning her need for leave.

11.    With the benefit of necessary short-term medical leave, Ms. Isaacs would have been fully capable of resuming and performing her job responsibilities following recovery. However, as a direct consequence of VWGOA's improper refusals to engage in the required interactive

---

[2] At the Long Island location, Ms. Isaacs was required to work out of a small room in the rear of a dealership, situated in a dangerous neighborhood, in a building that also housed a strip club on the floor above.

[3] "Out of trust" on a floor plan refers to a situation where a dealer sells vehicles that was financed through a floor plan loan through VWGOA, but the dealer fails to pay off the loan to VWGOA with proceeds from the sale creating an issue for VWGOA.

process and VWGOA's active discouragement of her reasonable requests for short-term disability leave, Ms. Isaacs's medical condition deteriorated significantly.

12.     Ms. Isaacs was also the target of and subjected to egregious harassment by a fellow co-worker, Scott Mann. Despite VWGOA's professed "Zero Tolerance" policy for any harassment, and despite the extensive evidence provided by Ms. Isaacs to her supervisor Mr. McNelis, including emails, phone records, text messages, and social media communications, Ms. Isaacs's complaints were never formally documented to human resources.

13.     Pursuant to VWGOA policy, harassment required immediate reporting within VWGOA and a decision by VWGOA on the initiation of formal disciplinary measures. Instead, Ms. Isaacs's supervisor Mr. McNelis merely spoke with the co-worker, dismissed his conduct as "harmless," and took no further action, in direct violation of VWGOA's own policies and procedures.

14.     VWGOA subsequently terminated Ms. Isaacs's employment under the false pretext of eliminating her position. In truth, Ms. Isaacs's termination was the direct result of her reporting her disability and harassment. Rather than engaging in the interactive process required by law to accommodate her well-documented disability, VWGOA willfully disregarded its obligations and chose instead to terminate her.

15.     VWGOA's termination of Ms. Isaacs's was retaliatory, not only in response to her repeated requests for disability-related accommodation, but also in reprisal for her protected complaints regarding the harassment she endured from a co-worker.

## PARTIES

16.    Plaintiff, Nancy Isaacs, is a natural person, citizen of the United States, and a resident of the State of New York. Ms. Isaacs is, and at the time of her termination was, fifty-three (53) years of age.

17.    Defendant, VWGOA, is and was, at all relevant times herein, a New Jersey corporation formed under the State of New Jersey with its corporate headquarters located in Virginia.

18.    At all relevant times, Plaintiff was a covered "employee" as defined in the New York's Human Rights Law (N.Y. Executive Law § 296, *et seq*.).

19.    At all relevant times, Defendant VWGOA was and still is an employer as defined in New York's Human Rights Law (N.Y. Executive Law § 296, *et seq.*).

20.    Plaintiff has a documented back disability and therefore was regarded as an individual with disability within the meaning of the New York's Human Rights Law (N.Y. Executive Law § 296, *et seq*.).

21.     At all relevant times, VWGOA was aware of Ms. Isaacs's disability.

22.    At all relevant times, Ms. Isaacs was qualified and able to perform the essential functions of her job with VWGOA with reasonable accommodation despite her disability.

23.    VWGOA has a stated "Zero Tolerance Policy" for any type of harassment.

## JURISDICTION, VENUE, & PROPERLY ASSERTED CLAIMS IN COURT[4]

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

25.     Personal jurisdiction in this District is proper because VWGOA has purposefully availed themselves of the privilege of conducting business in the State of New York, and because a substantial part of the events and omissions giving rise to the claims against VWGOA occurred in the State of New York.

26.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omission giving rise to the claims against VWGOA occurred in this District.

## THIS MATTER IS NOT SUBJECT TO MANDATORY ARBITRATION

27.     It is anticipated that VWGOA may move to compel mandatory arbitration or, alternatively, to dismiss this matter for lack of subject matter jurisdiction. However, it is well settled that a party will not be compelled to arbitrate, and therefore surrender the right to the courts, absent evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes. In the case of Ms. Isaacs, there was no agreement or consent to waive a jury trial or to agree to arbitration on Plaintiff's part.

---

[4] Plaintiff intends to file a charge with the U.S. Equal Opportunity Commission ("EEOC"). Plaintiff reserves the right to amend her Complaint to add violations of 42 U.S.C. § 2000e et seq., Title VII of the Civil Rights Act of 1964 ("Title VII") and other claims that arise under federal law after exhausting her administrative remedies.

28.     When Ms. Isaacs was hired in September 2014, she never completed or signed any employment packet. The packet that was presented by VWGOA to Ms. Isaacs contains multiple critical errors, bears no signature and, by its own terms, requires a valid signature to be effective.

29.     Upon information and belief, VWGOA fraudulently prepared and presented her employment packet after the fact, falsely attributing it to Ms. Isaacs. *See* **Exhibit "A."**

30.     Upon information and belief, six (6) years after she was employed, VWGOA claims that Ms. Isaacs may have been required to take a mandatory arbitration "training module" during her employment, although she never executed any arbitration agreement[5] in connection with that module.

31.     Moreover, as the training module was imposed as a condition of continued employment at a time when she was already employed, there was no consideration exchanged for Ms. Isaacs purportedly relinquishing any rights, and no intent on Ms. Isaacs' part to waive her right to pursue claims in court.

## **FACTUAL ALLEGATIONS**

32.     VWGOA hired Ms. Isaacs on or about September 15, 2014 as a Business Development Manager.

33.     As the Business Development Manager, Ms. Isaac's role was integral to VWGOA's regional operations, involving financial product promotion, dealer training, asset management, audit resolution, and performance optimization.

---

[5] Ms. Isaacs does not recall ever completing any arbitration "training module" and does not concede that she did so.

34.    Ms. Isaacs's duties included traveling to Volkswagen and Audi dealerships across the Northeast Region, attending conference calls, responding to emails, and traveling to various dealerships for meetings.

35.    While employed at VWGOA, Ms. Isaacs was dedicated, compliant, committed and above all else a team player.

## Defendant's Guide to Employees Relating to Applying For Disability

36.    VWGOA's Employee Leave Handbook (the "Handbook") serves as the official guide for employees and managers regarding leaves of absence. It sets forth "whom to contact, and the responsibilities of the different parties involved in leave administration." *See* **Exhibit "B,"** Employee Leave Handbook.

37.    Critically, the Handbook ***requires*** that all employees notify their manager directly of any disability leave requests. *Id*. at pg. 13.

38.    Under the Handbook, VWGOA, through its disability administrator, recognizes two types of disability leave: (i) Short-Term Disability, which may extend for up to twenty-six (26) weeks, and (ii) leave under the Family and Medical Leave Act ("FMLA"). When an employee initiates a disability request, VWGOA is obligated to review the employee's eligibility for both categories.

## Background Relating to Ms. Isaacs' Disability

39.    Starting in 2017, Ms. Isaacs began experiencing progressively worsening back pain. Ms. Isaacs did everything she possibly could to manage her symptoms. This included a combination of trigger point injections, epidurals, physical and massage therapy, chiropractic treatment, and inversion therapy.

40.     In July 2022, medical professionals determined that a mammoplasty was necessary to alleviate pressure on Ms. Isaac's neck and back.

41.     On August 11, 2022, Ms. Isaacs underwent her first mammoplasty.

42.     With respect to this procedure, VWGOA did in fact approve of Ms. Isaacs's short-term disability after Ms. Isaacs first spoke with John McNelis, VWGOA's Northeast Regional Director, and after she obtained Mr. McNelis' approval to take leave.

43.     The process to apply for disability in 2022 was straightforward and required the completion of only two forms.

44.      In late winter 2022 to early spring 2023, VWGOA became entrenched in a title processing issue following a transition to a new title vendor. Given her background with the Department of Motor Vehicles, Ms. Isaacs volunteered to assist with resolving the matter.

45.     By late April 2023, it was determined that the "Title Escalation Team"[6], of which Ms. Isaacs was a member, would travel to South Carolina to work directly with the new vendor.

46.     Prior to the trip, Ms. Isaacs e-mailed Rik Wall, Vice President of Sales, inquiring whether the assignment would involve extensive bending or lifting.

---

[6] By way of background, car dealerships cannot lawfully sell vehicles without valid physical titles, and at the time many dealerships were experiencing delays caused by title-related issues.  The problem arose when VWGOA engaged a new title vendor, DDI Technology, which was unprepared and incapable of handling the volume of titles required by VWGOA. To address the crisis, VWGOA established a Title Escalation Team. Ms. Isaacs **_volunteered_** to join this team, and VWGOA relied on her to travel to South Carolina for several weeks to assist with operations, provide quality control, and ensure that titles were distributed to the appropriate dealerships. During this period, Ms. Isaacs worked twelve-hour shifts conducting quality-control verification of title processing. As a direct result of the required travel, Ms. Isaacs incurred personal expenses of approximately $500 per week for pet boarding, sitting, and care—costs that VWGOA did not reimburse.
.

47.     During a subsequent conference call, Mr. Wall assured Ms. Isaacs that no such physical demands would be required.

48.     Upon arrival at the title vendor's facility in South Carolina, Ms. Isaacs reiterated her concerns directly to Mr. Wall and disclosed her chronic back issues. Mr. Wall expressly acknowledged her medical condition during this discussion.

49.     In 2023, Ms. Isaacs continued treatment for her chronic neck and back pain through additional trigger point injections, epidurals, radiofrequency ablation procedures, muscle relaxers, and physical therapy. Some of these procedures required Ms. Isaacs to be sedated. Despite these efforts, her symptoms did not improve.

## Ms. Isaacs's Repeated Requests for Reasonable Accommodation and VWGOA's Failure to Engage in an Interactive Process

50.     In November 2023, Ms. Isaacs underwent a second mammoplasty. Her Manager, Mr. McNelis, was made aware of the procedure. As was required, Ms. Isaacs requested to go out on Short Term Disability first with her Manager, Mr. McNelis.  The goal of Ms. Isaacs requesting to go out on Short Term Disability was to accomplish reasonable accommodation for her disability so that she could recover and later return to work and fully perform all essential functions of her job.

51.     In response to Ms. Isaacs's initial request, Mr. McNelis referenced another VWGOA employee, Karen Riveros, who had previously taken disability leave. He disparaged the process involved with Ms. Riveros's leave, characterizing it as a "pain in the ass" and describing "what a nightmare the paperwork was." Ms. Isaacs reasonably perceived these statements as an effort to discourage her from exercising her right to pursue disability leave.

52.     On January 1, 2024, Ms. Isaacs was diagnosed with COVID-19, which significantly and quickly worsened her back condition. As a result, she found it severely difficult to perform

daily work tasks without accommodation due to her issues with driving, sitting, or standing for extended periods.

53.     In January 2024, Ms. Isaacs advised Mr. McNelis of her medical condition, including her physical limitations and inability to walk, as well as her ongoing efforts to obtain relief, identified a surgeon with whom she was comfortable, and advised of her intent to pursue appropriate medical treatment. During this conversation, Ms. Isaacs reiterated, again for the ***second time***, her intent to take disability leave. In response, Mr. McNelis once more referred to Ms. Riveros's prior leave as a "nightmare." Ms. Isaacs reasonably understood these repeated remarks as a deliberate attempt to discourage her from exercising her right to apply for disability leave.

54.     On January 12, 2024, Ms. Isaacs underwent two epidural injections and was referred to a spinal surgeon by her pain management specialist. She was diagnosed with advanced spinal degeneration at the L4/L5/S1 levels, including degenerative disc disease, spondylolisthesis, and spinal stenosis. These conditions are incurable but manageable and resulted in a permanent disability diagnosis. Surgical intervention, including a two level Transforaminal Lumbar Interbody Fusion ("TLIF"), a spinal fusion, and laminectomy, was recommended.

55.     On January 17, 2024, Ms. Isaacs exchanged emails with Sakina Areez of Human Resources to inquire about the procedures for taking disability leave. Following this exchange, a conference call was held during which Ms. Isaacs was advised of the eligibility requirements and parameters for disability leave, including that she would need to obtain approval from her manager, Mr. McNelis, before being permitted to go out on leave.

56.     On January 26, 2024, Ms. Isaacs notified Rebecca Johnson of Human Resources that she needed assistance obtaining approval for the medical procedure related to her upcoming TLIF procedure.

57.     By February and March 2024, Ms. Isaacs's condition had significantly worsened, and she informed Mr. McNelis that she was in extreme pain, unable to walk, stand and sit for long periods of time.

58.     Ms. Isaacs was unable to attend the 2024 VWGOA National Sales Meeting in Virginia due to her disability.

59.     On March 23, 2024, Ms. Isaacs underwent an L5/S1 spinal fusion and remained hospitalized for five (5) days due to post-surgical complications. Despite her surgeon's clear recommendation that she take disability leave to recover, her supervisor, Mr. McNelis, directed her to use sick time and to work from home upon discharge—thereby actively discouraging her from applying for short-term disability benefits.

60.     On March 29, 2024, Ms. Isaacs expressly informed Mr. McNelis of her decision, and requested *for **_the third time_*** to take short-term disability leave due to post-surgical complications, including issues with blood pressure and bladder function, which required the continued use of a catheter for ten (10) days following her discharge. Despite this reasonable request, Mr. McNelis ***_refused her request_*** and reiterated that she should instead continue to work from home.

61.     By this time, VWGOA's refusal to accommodate Ms. Isaacs's request for short-term disability leave, despite the recommendation of her medical professional, denied her the opportunity to recover, exacerbated her disability, and directly caused additional health complications, all as a result of VWGOA's failure to provide a reasonable accommodation.

62.     During the last week of May 2024, Ms. Isaacs resumed visiting dealers, using a cane for mobility. She continued to experience numbness in her right arm, spasms in her left leg, and ongoing bladder issues.

63.     On June 11, 2024, a Northeast Region meeting was held at the Company's Audi parts depot in Cranbury, New Jersey. Due to the lengthy drive and the prolonged sitting it would require (both of which would aggravate her diagnosed disability), Ms. Isaacs was unable to attend the dinner portion of the event. She informed Mr. McNelis of her inability to attend.

64.     On June 12, 2024, Ms. Isaacs attended the meeting at the Company's Audi parts depot. Present at the meeting were several of her colleagues from the Northeast Region, along with Mr. McNelis; Mark Ilijanic, Senior Vice President of Customer Experience Strategy and Sales at VWFS; and Rik Wall. During the meeting, Ms. Isaacs spoke with both Mr. Ilijanic and Mr. Wall regarding her back condition and explained that she was using a cane due to a recent spinal fusion surgery, which had taken place approximately ten (10) weeks earlier.

65.     In July 2024, while leaving her house to visit dealers, Ms. Isaacs' leg gave out, causing her to fall. She informed Mr. McNelis of the incident and reported continued numbness, leg spasms, and difficulty standing for extended periods.

66.     On December 9, 2024, Ms. Isaacs underwent a five-level foraminotomy surgery spanning C3 through C7. Ms. Isaacs was hospitalized for three (3) days for this surgery, due to complications once again with her blood pressure and bladder. Approximately two (2) weeks after the surgery, it was discovered that a disc at the C1/C2 level was pressing on her optic nerve, causing severe migraines that frequently left her bedridden. To manage the pain, Ms. Isaacs received a nerve block. Following the surgery and related complications, her surgeon again told Ms. Isaacs that she should take disability leave to recover.

67.     On December 16, 2024, Ms. Isaacs emailed Diane Kemon in Human Resources to inquire about disability leave. In response, Ms. Kemon explained the details of disability and FMLA benefits, noting that Ms. Isaacs would be designated as an inactive employee but could continue receiving medical coverage for up to two (2) years if necessary. Significantly, Ms. Kemon also instructed Ms. Isaacs that it was her responsibility to first raise the disability request with her direct supervisor, Mr. McNelis, despite the fact that Ms. Isaacs had already done so on multiple occasions, only to have her requests repeatedly discouraged.

68.     On December 19, 2024, a National Sales Meeting was held in Auburn Hills, Michigan. Although Ms. Isaacs had undergone a five-level cervical foraminotomy just ten (10) days earlier, she felt significant pressure to attend the meeting due to an impending transition between Volkswagen Financial Resources ("VWFS") and Wells Fargo.[7] Having already missed the previous National Sales Meeting in Virginia, Ms. Isaacs believed she had no real choice but to participate.

69.     On the first evening of the meeting, a group dinner was scheduled to take place at a restaurant approximately one (1) mile from the hotel. While most attendees gathered in the lobby to walk to the venue, Ms. Isaacs opted to drive her vehicle to avoid the risk of slipping on ice or snow due to her recent surgery. She notified Mr. Wall, Mr. Ilijanic, and Mr. McNelis of her decision to drive and reminded them of her recent cervical spine surgery and ongoing back issues. Upon arriving at the restaurant, Ms. Isaacs parked in a handicap designated space using her valid handicap parking permit. When questioned about her use of the space, Ms. Isaacs again explained that she had recently undergone surgery and continued to experience chronic back problems.

---

[7] VFWS is the financial services arm of VWGOA, and the transition entailed designating Wells Fargo as the preferred purchase financing provider for the Volkswagen and Audi brands in the United States market.

70.     On January 27, 2025, Ms. Isaacs was informed that her spinal fusion had failed. She had developed adjacent disc disease, scoliosis, and a collapsing spine, and was advised she now required a four-level lumbar fusion. However, due to complications from her previous surgery, she was unable to undergo the procedure for a few months.

71.     Ms. Isaacs's surgeon advised her that she had to be very careful walking as one wrong move could cause her spine to fully collapse. The following day, January 28, 2025, she advised Mr. McNelis of her medical condition, the treatment plan, the risks, and her need to wait until March to have the surgery. Mr. McNelis ***yet again for a fourth time*** advised Ms. Isaacs not to take disability leave, stating that he needed all "hands on deck" and staff available during VWFS's transition of its retail operations to Wells Fargo. He also reiterated yet again how much of a "pain in the ass" the disability paperwork was.

72.     In February 2025, Ms. Isaacs was required by Mr. McNelis to travel several hours to visit two dealerships, one located in Utica, New York, and the other in Middletown, New York, to ensure that dealer agreements connected to the upcoming Wells Fargo transition were executed. This directive came directly from Mr. McNelis and was in direct conflict with his recent prior instruction that Ms. Isaacs should work from home due to her disability.

73.     On March 24, 2025, Ms. Isaacs underwent her second spinal fusion surgery, involving four (4) levels of the spine. Following the procedure, Ms. Isaacs experienced complications related to blood pressure and bladder function, resulting in an eight (8) day hospitalization. During her stay, Ms. Isaacs suffered a medical emergency. She advised Mr. McNelis and once again, for the ***fifth time***, requested permission from Mr. McNelis to take a disability leave. Mr. McNelis, however, again advised her not to do so.

15

74.    From April 1st to April 15, 2025, after being released from the hospital, Ms. Isaacs experienced significant physical limitations. She was unable to walk without the assistance of a cane or walker and was unable to bend or lift objects heavier than a gallon of milk.

### Ms. Isaacs Is Sexually Harassed During the Time During Which VWGOAS Was Refusing Reasonable Accommodations For Disability

75.    During the same period in which VWGOA was denying Ms. Isaacs's requests for reasonable accommodation of her disability, she was simultaneously subjected to egregious, pervasive, and ongoing harassment by a fellow employee, Scott Mann (December 2023/January 2024).

76.    VWGOA has a "Zero Tolerance" policy for any type of  harassment stating that "*Discrimination of any kind through the exercising of partiality or harassment, most notably any form of sexual harassment, stalking or mobbing, constitutes a serious disruption of the status quo…Every employee as well as the company is therefore under obligation to prevent discrimination and to promote and maintain a co-operative climate*." *See* **Exhibit "C",** Co-Operative Conduct at the Workplace.

77.    VWGOA policy further defines sexual harassment as "*unsolicited sexual acts or invitations/requests to engage in such, physical contact which is sexually motivated, sexual remarks (and) displays of pornographic material. What constitutes sexual harassment is determined by the subjective feelings of the recipient party*." *See* **Exhibit "C."**

78.    The VWGOA policy states that every employee has a "Right to Complaint" and "The Complaint must be looked into and the finding reported back to the employee." *See* **Exhibit "C."**

79.    Ms. Isaacs was subjected to ongoing harassment by Scott Mann from December 2023 through January 2024. In December 2023 alone, Mr. Mann placed more than twenty-seven

(27) missed calls to Ms. Isaacs, sent numerous text messages across multiple messaging platforms, and repeatedly contacted her through social media.



80.     On January 10, 2024, Ms. Isaacs received an email from Mr. Mann demanding that she call him. In response, Ms. Isaacs replied that his conduct constituted harassment and stalking, and she expressly demanded that he cease all further contact including calls, texts, and emails. She further warned that if he continued to reach out, she would escalate the matter and inform her supervisor, Mr. McNelis, of the ongoing and persistent harassment.

81.     On January 27, 2024, Mr. Mann again persisted in contacting Ms. Isaacs, this time through the social media platform Pinterest, despite her clear directive that he cease all communication. He sent her an article entitled *"55 Flattering Short Hairstyles for Women Over 50,"* which Ms. Isaacs, who does not wear her hair short, reasonably perceived as an unwelcome, demeaning, and sexually harassing and age discriminating message.



82.     That same day, Ms. Isaacs reported the harassment to Mr. McNelis and informed him of the ongoing conduct. She forwarded her original email to Mr. Mann demanding that he cease contact, along with more than ten (10) pages of missed calls, multiple text messages, and screenshots of social media communications.

83.     Mr. McNelis stated that he would speak with Mr. Mann and follow up with Ms. Isaacs later that day. Subsequently, Mr. McNelis advised Ms. Isaacs that he had spoken with Mr. Mann and expressed confidence that the harassment would cease.

84.     Ms. Isaacs was not comfortable with Mr. McNelis's informal handling of the matter. She expressed her concerns and specifically requested that Human Resources formally document the harassment. Mr. McNelis, however, dismissed her concerns, asking that they "*give it a week*," assuring her that Mr. Mann had "*gotten the hint*" and was "*harmless*."

85.     Approximately one week later, Mr. McNelis and Ms. Isaacs spoke again, at which time he stated he was confident the issue had been resolved. Ms. Isaacs again requested that the matter be formally documented in Mr. Mann's personnel file by human resources. Mr. McNelis refused, stating that it would only be revisited if the conduct occurred again.

86. Mr. McNelis' response was in direct violation of VWGOA's own policies, which states every employee has a "Right to Complaint" and *The Complaint must be looked into and the finding reported back to the employee.*" There should have been a formal report back to Ms. Isaacs, written documentation and formal disciplinary measures, yet VWGOA wholly disregarded these obligations. *See* **Exhibit "C."**

87. By failing to act on Ms. Isaacs's complaint, Mr. McNelis effectively condoned the harassment and fostered a "boys' club" culture that protected Mr. Mann rather than Ms. Isaacs. In doing so, Mr. McNelis showed preferential treatment for a select group of male employees that he has a close relationship with.

88. This harassment occurred concurrently with the worsening of Ms. Isaacs's back disability and VWGOA's refusal to provide reasonable accommodations. The resulting stress further aggravated her medical condition and compounded the harm she suffered.

## VWGOA Retaliates in Response to Ms. Isaacs's Reasonable Requests for Accommodation and Her Reports of Sexual Harassment by Terminating Her

89. On April 30, 2025, Mr. McNelis requested that Ms. Isaacs join a same-day Microsoft Teams call.

90. Unaware of the purpose of the meeting, Ms. Isaacs joined the call and was unexpectedly met by two human resources representatives, Janessa and Diane. During the call, she was informed for the first time that her "position was being eliminated" and the stated reason for the termination was a Wells Fargo shift.

91. Ms. Isaacs was then presented with a purported "severance package," which was in reality an effort concocted to shield VWGOA from legal liability and to obtain a release of claims stemming from its discriminatory conduct.

92.    On May 1, 2025, Ms. Isaacs requested a conversation with Mr. McNelis regarding the elimination of her position. She inquired whether he had prior knowledge of the decision and whether that may have influenced his earlier advice against her taking disability leave.

93.    In response, Mr. McNelis stated that he was "insulted" by the suggestion that he had discouraged Ms. Isaacs from taking short-term disability leave for his own benefit. For the first time, and in a transparent attempt designed merely to protect himself, Mr. McNelis directed Ms. Isaacs to contact Human Resources to determine whether she should pursue disability leave.

**VWGOA Humiliates Ms. Isaacs' Following Her Termination**

94.    On May 6, 2025, while still technically still employed by VWGOA (she was required to continue her work responsibilities following notification of her termination in order to be eligible for any "severance package"), Ms. Isaacs participated in a conference with the entire Northeast Team. During that call, at 10:17 a.m., Mr. McNelis publicly announced that Ms. Isaacs was the only Business Development Manager employee at VWGOA whose position was being eliminated.

95.    Mr. McNelis advised the team that there would be no further layoffs among the Business Development Managers or within the Sales Team. He further claimed that other regions had met their layoff quotas by leaving certain Business Development positions created through employee departures, promotions, or retirements vacant. This statement was false and misleading, as a Business Development position in Atlanta, Georgia had, in fact, been filled by an external hire in December 2024. This conversation and misrepresentation caused significant embarrassment to Ms. Isaacs.

96.    Despite the reduction in force in which seventy (70) other people from other departments lost their jobs, Ms. Isaacs was the only Business Development Manager throughout

VWGOA to be singled out and terminated. (There were forty-four Business Managers in total at VWGOA.)

97.     On May 8, 2025, after VWGOA had already issued notice of her termination, Mr. McNelis finally conceded that Ms. Isaacs could take disability leave. Only at that point did Ms. Isaacs apply for Short-Term Disability. Ms. Isaacs did so because she recognized that she would be physically unable to perform the daily requirements of her position necessary to secure her severance package and, by that time, she had already been terminated and she no longer feared reprisals or being blacklisted by Mr. McNelis.

98.     Accordingly, Ms. Isaacs was approved for Short-Term Disability, which began on May 9th, and she remained on Short-Term Disability through Lincoln Financial until her formal termination date of July 11, 2025.

99.     Ultimately, a proposed severance package, initially consisting of a $41,000.00 payment was withdrawn when Ms. Isaacs refused to sign a general release of her statutory discrimination claims.

### VWGOA's Reason For Terminating Ms. Isaacs Was Pretextual and Retaliatory

100.     The purported justification for Ms. Isaacs's termination was an alleged "restructuring" and reduction in force, said to result from VWGOA's decision to transfer a significant portion of Volkswagen Financial Services (a wholly owned subsidiary of VWGOA) to Wells Fargo.

101.     To further this pretext, Mr. McNelis claimed that Ms. Isaacs had received a lackluster performance review in 2024, despite the fact that she received historically excellent reviews as well as accolades from her colleagues.

102.    In reality, up until the time her requests to go out on short-term disability leave began to be rejected, Ms. Isaacs was a dedicated, compliant, and committed team player. By way of illustration, in 2023 Ms. Isaacs received an exemplary review as well as a handwritten card and gift from the President/CEO/ Treasurer of VWFS personally thanking her for her instrumental role in successfully resolving the Title Transfer issue.

103.    Further, Ms. Isaacs was the only one of thirteen (13) Business Development Managers in the Northeast Region as well as the only one of forty-four (44) Business Development Managers throughout the country who were selected for termination.

104.    In addition, at the time she was terminated, Ms. Isaacs was the only Business Development Manager residing in New York, strategically based in Albany, which allowed her to effectively manage both the downstate and upstate New York markets.

105.    Nevertheless, in an act of discrimination against Ms. Isaacs, Mr. McNelis  replaced Ms. Isaacs by personally endorsing a close friend and former (male) coworker Christopher Mignano to cover a portion of  her territory thereby strengthening his market, despite the fact that he resided six (6) hours away from the market he was to cover. In doing so, Mr. McNelis demonstrated his preferential treatment for a select group of male employees he had had a long-term relationship with.

106.    At the same time, two male Business Development Managers, both sixty-seven (67) years old and approaching retirement and eligible for early retirement, were also retained and protected by Mr. McNelis, again showing Mr. McNelis's preferential treatment for a select group of male employees, while Ms. Isaacs, a woman who required disability accommodations, was singled out for termination.

107.    The timing and manner of Mr. McNelis's public announcement on May 6, 2025, further demonstrates that Ms. Isaacs's termination was not only discriminatory, but also deliberately demeaning and retaliatory. Mr. McNelis's actions were motivated by concern that Ms. Isaacs would expose his repeated refusals to address her requests for reasonable accommodation and her complaints of sexual harassment by Mr. Mann.

108.    In view of the totality of the circumstances, the downsizing is an entirely pretextual reason and served only as a cover for unlawful discrimination and retaliation.

## VWGOA Denies Responsibility Mr. McNelis' Actions

109.    In responding to Ms. Isaacs' claims, VWGOA has conceded that "Ms. Isaacs indeed has a back issue" but denied ever discriminating against her or discouraging from applying for short-term disability. Instead, VWGOA asserts that "*it is a personal decision and not one that the company would ever instigate on behalf of an employee, especially to one so familiar with the process as was Ms. Isaacs*." ***See*** **Exhibit "D."**

110.    VWGOA has further taken the position that, with respect to Mr. McNelis's statements referring to disability leave as a "pain in the ass" and a "nightmare," "he did that, too," and "(t)hat Ms. Isaacs now tries to spin this into some nefarious or ominous warning to not dare to take time off is her issue." *See* **Exhibit "D."**

111.    VWGOA also cited Ms. Isaacs's so-called 'subpar review' in 2024, which was not issued until March 2025. This was the first performance review in which she received any negative feedback concerning the competency section of her review.

**Mr. McNelis's Discriminatory Treatment of Ms. Isaacs and VWGOA's Executive-Level Awareness of His Discriminatory Practices**

112.    During her performance review with Mr. McNelis, he suggested that Ms. Isaacs should engage more frequently with her dealers by taking them to lunch or dinner. This comment was made despite the fact that, for much of 2024, Mr. McNelis had encouraged her to work from home due to her disability. Notably, these remarks came only after Ms. Isaacs had repeatedly requested short-term disability leave, a request that Mr. McNelis had consistently discouraged.

113.    VWGOA's position overlooks the fact that Ms. Isaacs did, in fact, raise her concerns with Human Resources when she emailed Diane Kemon on December 16, 2024, specifically inquiring about disability leave. Yet Ms. Kemon failed to advise Ms. Isaacs that applying for disability benefits was an "independent right." In direct contrast to this, Ms. Kemon directed Ms. Isaacs to first request approval of her supervisor, Mr. McNelis, even though Ms. Isaacs had already done so on multiple prior occasions, only to have her requests repeatedly denied.

114.    VWGOA's position also ignores the reality that Mr. McNelis, as Ms. Isaacs's direct supervisor, occupied a position of authority over her and that his repeated comments carried weight. As a subordinate, Ms. Isaacs was necessarily deferential to his directives and understood that circumventing him by applying for disability would risk being blacklisted at VWGOA. Having raised the issue with him on at least five occasions, Ms. Isaacs reasonably understood Mr. McNelis's repeated statements as rejecting her requests and that pursuing disability leave would reflect poorly on her and place her position and standing within VWGOA in jeopardy.[8]

---

[8] In reality, filing for short-term disability was a relatively straightforward process for Ms. Isaacs and not the "pain in the ass" as characterized by Mr. McNelis. The only barrier to her filing was Mr. McNelis himself. Had he not discouraged her to take disability leave, VWGOA would not have had the ability to terminate her employment while she was on leave.

115.    Although Mr. McNelis professed empathy for Ms. Isaacs's condition, his actions demonstrated the opposite. Ms. Isaacs repeatedly informed him of the severity of her medical issues and advised that she was considering short-term disability, yet he failed to acknowledge that both her health and her market were suffering. A reasonable supervisor, acting in good faith, would have counseled her to prioritize her health and supported her decision to take disability leave. Instead, Mr. McNelis actively discouraged her from doing so, characterizing the process as burdensome, and prioritizing VWGOA's profits over her well-being. Mr. McNelis's conduct reflected not empathy, but a disregard for Ms. Isaacs's health, and constituted a fundamental failure to responsibly manage both her and her market.

116.    Ms. Isaacs was continuously discouraged from applying for disability by Mr. McNelis telling her over and over again how much of a "pain in the ass" the paperwork/process was.  Ms. Isaacs as a subordinate always remained compliant and respectful to her supervisor's requests and would never disobey her supervisor.

117.    VWGOA has asserted that Ms. Isaacs was familiar with the process for applying for disability leave, and that is correct—she had previously done so in 2022. However, there was no benefit to Ms. Isaacs in working from home rather than applying for disability. She refrained from applying because she was repeatedly discouraged from doing so and reasonably believed that pursuing disability leave would have negative consequences for her standing within VWGOA.

118.    The foregoing facts, and VWGOA's denial of responsibility shows that VWGOA's highest executives were and are actually aware of Mr. McNelis's discriminatory and preferential treatment by purposefully ignoring VWGOA's compliance guidelines and requirements, thereby depriving employees such as Ms. Isaacs from their right to take leave to treat a  disability, as well

as fostering a "boys club" for a select group of male employees that he gives preferential treatment to .

**VGWOA's Actions Directly Contributed to the Worsening of Ms. Isaac's Disability**

119.    VWGOA's conduct effectively forced Ms. Isaacs to self-withhold necessary pain medication while still requiring her to shoulder the full responsibilities of her market, thereby interfering with her recovery and prohibiting proper healing. Ms. Isaacs forestalled her recovery and endured significant daily suffering because she refrained from taking her prescribed pain medication, nerve medication, and muscle relaxers out of fear that doing so would cause her to miss a conference call, a dealer call, or a time-sensitive report.

120.    As a direct result of VWGOA's conduct, Ms. Isaacs's medical condition has materially deteriorated, causing her to endure loss of sleep, anxiety, heightened stress, significant physical complications including edema, increased medical risks, and prolonged pain and suffering.

**VGWOA's Actions Directly Contributed to Post Termination Financial Harm and Were Retaliatory**

121.    As a direct result of their conduct, VWGOA deprived Ms. Isaacs of legal protection under the New York State Family Leave Act, which would have expressly prohibited VWGOA from terminating her during the time period she would have been on leave.

122.    Moreover, the elimination of Ms. Isaacs's position just four and a half (4.5) weeks after she underwent a four-level spinal fusion placed her in an untenable financial and professional position. Because she had not yet been medically cleared by her surgeon to return to work, she was ineligible to collect New York State unemployment benefits. At the same time, the application

process for Social Security Disability Insurance ("SSDI") benefits takes nearly a year to complete. As a result, following the termination Ms. Isaacs was left without any source of income.

123.    Since her termination, Ms. Isaacs has encountered significant difficulties with Human Resources in attempting to secure COBRA Insurance Consolidated Omnibus Budget Reconciliation Act ("COBRA") continuation coverage.

124.    On July 27, 2025, Ms. Isaacs applied for COBRA through the required site and attempted multiple times to pay her premium. She was initially told a bill would be generated within five (5) business days, then later informed it would be available on August 12, 2025. However, she was subsequently locked out of the site. Despite repeated calls to the help line, Ms. Isaacs was told only that "a ticket had been opened" and advised to pay out of pocket for medical needs, with reimbursement to follow once payment was processed and coverage made retroactive to August 1, 2025.

125.    On August 14, 2025, after raising the issue with VWGOA's Human Resources Consultant Patricia Rothstein, Ms. Isaacs was told her coverage was active. Yet, when she attempted to refill prescriptions on August 17, 2025, Ms. Isaacs was billed $1,683 and informed she no longer had coverage.

126.    Similarly, a scheduled Radio Frequency Ablation procedure was denied for lack of coverage.

127.    As a direct result of VWGOA's failure to properly facilitate her COBRA coverage, Ms. Isaacs has been billed exorbitant amounts for medications despite having met her deductible and has been forced to cancel necessary medical procedures, physical therapy, and doctor visits. To date, she remains unable to make payments under COBRA or access the system.

128.    Upon information and belief, the foregoing actions by VWGOA were purposeful, as VWGOA intended to deprive Ms. Isaacs of income, resources, and the ability to pursue legal action in further retaliation for her pursuit of well-established statutory rights.

## AS AND FOR A FIRST CAUSE OF ACTION
(Discrimination Based on Disability)
(New York State Human Rights Law (Executive Law § 296 et. seq.))

129.    Plaintiff repeats and realleges each and every allegation as if fully stated herein.

130.    New York State Human Rights Law (NYSHRL) prohibits any employer from discriminating against an employee in the terms and conditions of employment based on a disability or a perceived disability.

131.    Plaintiff suffers from a disability within the meaning of the NYHRL.

132.    Plaintiff is a covered employee under the NYSHRL.

133.    Defendant VWGOA was notified of, and had actual knowledge of, Ms. Isaacs's disability.

134.    Despite this knowledge, VWGOA violated the NYSHRL/ by failing to engage in the interactive process required to identify and implement reasonable accommodations, specifically by discouraging Ms. Isaacs's from taking disability, and by intentionally discriminating against her through its repeated deterrence of her reasonable requests.

135.    Defendant VWGOA, intentionally with malice and reckless indifference to Ms. Isaacs' rights and violated the NYSHRL by refusing to accommodate her disability and terminating her.

136.    As a direct result of VWGOA's discriminatory acts, Ms. Isaacs' is entitled to damages including, but not limited to, past and future lost wages and benefits, damages to

compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## AS AND FOR A SECOND CAUSE OF ACTION
(Sexual Harassment)
(New York State Human Rights Law (Executive Law § 296 et. seq.))

137.    Plaintiff repeats and realleges each and every allegation as if fully stated herein.

138.    New York State Human Rights Law (NYSHRL) prohibits any employer from subjecting any employee on the basis of their gender, including, but not limited, by permitting employees from being subject to sexual harassment.

139.    Defendant discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting her to disparate treatment, failing to enforce and document violations under its own Zero Tolerance Policy, and failing to address her subjected ongoing sexual harassment.

140.    As a direct result of VWGOA's discriminatory acts, Ms. Isaacs' is entitled to damages including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## AS AND FOR A THIRD CAUSE OF ACTION
(Gender Discrimination)
(New York State Human Rights Law (Executive Law § 296 et. seq.))

131.    Plaintiff repeats and realleges each and every allegation as if fully stated herein.

132.    New York State Human Rights Law (NYSHRL) prohibits any employer from subjecting any employee on the basis of their gender, including, but not limited, by permitting employees from being subject to sexual harassment.

133.    Plaintiff's direct supervisor, John McNelis, VWGOA's Northeast Regional Director, has demonstrated a preference for a male-dominated team. Mr. McNelis has consistently shown preferential treatment toward a select group of male employees with whom he maintains strong personal relationships.

134.    By failing to act on Ms. Isaacs's complaint, Mr. McNelis effectively condoned the harassment and fostered a "boys' club" culture that protected Mr. Mann rather than Ms. Isaacs. Mr. McNelis showed preferential treatment for a select group of male employees that he has a close relationship with.

135.    The foregoing facts support that VWGOA's highest executives are actually aware of Mr. McNelis ignoring its compliance guidelines and requirements, discouraging employees' such as Ms. Isaacs from going out on disability, as well as fostering a "boys club" and having preferential treatment for a select group of male employees he has strong relationships with, as well of his discriminatory and preferential treatment.

136.    As a direct result of VWGOA's discriminatory acts, Ms. Isaacs is entitled to damages including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**AS AND FOR A FOURTH CAUSE OF ACTION**
(Retaliation)
(New York State Human Rights Law (Executive Law § 296 et. seq.))

137.    Plaintiff repeats and realleges each and every allegation as if set forth at length herein.

138.    The NYSHRL prohibits an employer from discriminating against employees who ask for reasonable accommodations under the statute, or who exercise other rights the statute protects.

139.    Ms. Isaacs's termination was retaliatory, not only in response to her repeated requests for disability-related accommodations, but also in reprisal for her protected complaints regarding the sexual harassment she endured from a co-worker.

140.    Upon information and belief, the foregoing actions by VWGOA, including those post-termination, were purposeful, as VWGOA intended to deprive Ms. Isaacs of income, resources, and the ability to pursue legal action in further retaliation for her pursuing well established statutory rights.

141.    Ms. Isaacs is entitled to damages including, but not limited to, past future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against the Defendant as follows:

i)        On Plaintiff's First, Second and Third, and Fourth Causes of Action, recovery of no less than Five Million and 00/100 ($5,000,000.00) Dollars, exclusive of interest and cost against Defendant as actual damages for loss of revenue, including back pay, front pay, reimbursement for lost pension, loss of future pension benefits, loss of social security benefits, loss of other past and future benefits, mental anguish, emotional distress, embarrassment in an equal amount as liquidated damages, punitive damages, and compensatory damages, together with interest, as a result of Defendant's discrimination against Plaintiff;

ii)    A Declaratory Judgment that Defendant unlawfully discriminated against and
retaliated against Ms. Isaacs;

iii)    For recovery and costs and counsel fees as provided by statute;

iv)    For trial by jury on all triable issues;

v)    For such other and further relief as the Court may deem just and proper.


Dated: New York, New York
       August 27, 2025

                                                        Respectfully submitted,


                                                        YOOK DIPISA LLC


                                                        /s/ *Joseph DiPisa*
                                                        Joseph A. DiPisa, Esq.
                                                        14 Wall Street
                                                        20th Floor
                                                        New York City, New York 10005
                                                        Phone: (201) 655-9428
                                                        *Attorneys for Plaintiff Nancy Isaacs*
                                                        Email: joe@yookdipisa.com